NATHAN H. GORDON CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 93383, 108237. Promulgated August 14, 1943.

572

*Mark M. Horblit Esq.*, for the petitioner.
*James T. Haslam, Esq.*. for the respondent.

OPINION.

V<span>AN</span> F<span>OSSAN</span>, *Judge:* In the notice of deficiency respondent determined that the total value of the assets ($1,573,290.98) which reverted to petitioner by virtue of the assignment in 1931 to it by Gordon and his wife constituted income to petitioner when the assets were transferred in 1936. By amended answer respondent cast an anchor to windward and, as an alternative, alleged error on his part in not determining that petitioner received income in 1935 to the extent of the value of such assets on December 31, 1935, the date when the trusts terminated. The figure used as denoting the value of such assets is $1,568,912.32, being the alleged net value after deducting certain liabilities assumed by petitioner.

In his brief respondent apparently abandoned the extreme position above indicated and bases his support of the deficiencies on the argument that when the trusts terminated and the assets were transferred to petitioner there was a cancellation of the debt of $1,481,-965.41, principal and interest of the loan owed by petitioner to the trusts; that such cancellation created income to be computed by taking as a basis the value of the securities set aside by the petitioner to provide for the determinable periodic payments undertaken by it and treating the excess above such basis as gain. Obviously, the mere transfer of the property to petitioner did not result in income, as originally determined by respondent. If it was transferred without consideration it was in the nature of a gift. If the transfer was based on consideration it would be a purchase and not income. Income would result only from the sale or other disposition of the property given for it rather than upon receipt of such new property.

A complete answer to the present position of the respondent as indicated by the above departure from the theory of his original

determination is that the facts do not support his argument. There was no cancellation or forgiveness of the debt. There was an assumption by petitioner of a substantial obligation to make payments to ascertained persons in fixed amounts and to unascertained persons in indefinite and indeterminable amounts. Thus petitioner gave consideration for all it received. Even if the value of the promise to make the periodic payments were not equal to the value of the assets received, there would be no income from receipt of the property until subsequent sale or other disposition. Attention might also be called to the fact that all actual divestment of title took place in 1931, when the assignment of the reversionary rights took place. On December 31, 1935, when the trusts terminated, petitioner's rights fell in and petitioner merely assumed possession of its own property as the reversionary owner.

It is immaterial in what form the reversionary assets happened to be when they were transferred to the petitioner. Their undisputed value was $1,568,912.32. There is no showing that the petitioner's debt to the trusts was not worth its full face value. The responsibility of making the agreed payments had to be met by the petitioner. It could repay its loan in cash, it could furnish equivalent securities, or it could continue to pay interest on the principal of the loan. Its only concern was to see that it had sufficient income with which to pay the current demands as they became due. Had petitioner paid the loan in 1935 the cash thus coming into the hands of the trustee would have reverted to petitioner at the termination of the trusts. This fact would not have altered petitioner's position to its advantage. It still was obligated to make the payments to the several persons.

In reply to respondent's contention that less than the full amount of the assets is necessary to provide for the ascertained payments, it is only necessary to point out that the unascertained amounts that petitioner may have to pay may require all, or more than all, of the assets. Further, we would also point out that among the obligations assumed by petitioner was one to issue to Foundation its capital stock equal in value to the excess of the value of the reversionary property over the amount required to pay the scheduled installments. Thus petitioner would not stand to benefit from any such excess.

We are of the opinion, and hold, that petitioner received no income on the transfer to it of the assets of the several trusts.

In the second issue the respondent denied the right of petitioner to deduct the interest on loans due to the trusts accrued on its books for the years 1934 and 1935 because the interest was not in fact paid. On brief respondent contends, as he did as to the first item, that the debt of the loan and interest was canceled and that the same will never be paid. Our discussion of the facts and principles relating

to the loan apply equally to the interest. The unpaid interest was one of the assets of the trusts turned over to the petitioner in 1936. The money had been loaned by the trusts to the petitioner in bona fide transactions, with the obligation on the part of petitioner to pay interest and repay the principal. In 1934 and 1935 until the termination of the trusts, the trustees could have called upon the petitioner for the payment of interest and principal. Had the petitioner paid both the interest and principal shortly before the termination of the trusts the money would have gone right back to the petitioner as part of the assets of the trusts on termination. Payment under such circumstances would have been a purposeless gesture. On December 31, 1935, the petitioner had an obligation to pay the principal and interest on the loans. Thereafter the corpora of the trusts became the property of the petitioner and the obligation to make actual payment of interest and principal disappeared by reason of the merging of the identities of the parties to the obligation. Petitioner, however, gained nothing by having failed to pay such interest. Its obligation to pay the annuities was the same whether it paid the interest or not and that obligation persisted. The unpaid interest is one of the assets standing back of that obligation. Since petitioner's books were kept on an accrual basis, the interest accrued during the life of the trusts constitutes proper deductions from income.

In view of our decision on the first and second issues, issues ten and eleven require no discussion. There is no net income on which a penalty for delinquent filing for 1934 can be based. The applicability of the statute of limitations has now become moot.

The third, fourth, fifth, sixth, seventh, and eighth issues all involve the deductibility of items asserted to have been worthless and charged off the petitioner's books during the years in which the deductions are claimed. They are essentially issues of fact.

The facts in the third issue support the petitioner's right to the deduction. The petitioner bought the Prince note for $3,500; the debtor was persuaded to make payments on it (obviously credited to the interest due thereon); the debtor died; his estate was insolvent; after his death the Rubin Co. stock became worthless; the petitioner's treasurer determined in 1935 that there would be no recovery on the note, and consequently charged it off the petitioner's books as a bad debt. The deduction is allowed.

In the fourth issue the petitioner has not sustained its burden of proving that the 700 shares of stock of the Seaboard Utilities Shares Corporation purchased in 1929 became worthless in 1935. The facts indicate that the value of the stock had decreased materially, but they fall far short of establishing worthlessness. In fact the record discloses that in December 1940 Seaboard had over $130,000 in cash on

hand. No financial statement of the corporation was submitted. Thus we are unable to agree with petitioner. The respondent's action is approved.

The petitioner has failed to submit proof of the date of purchase or the price it paid for the stock of Bankstocks Corporation of Maryland to support its claim for deduction under the fifth issue. In such circumstances it is impossible to compute the loss, if any, of the petitioner upon the sale of the 100 shares of the preferred stock and the 50 shares of the common stock of that corporation. The deduction is not allowed.

The sixth issue presents the deductibility of a loss of $108,784.84 sustained upon the sale of bonds of the United Post Offices Corporation and stocks of Commonwealth Associates and Realty Holding & Investment Corporation. The petitioner has fixed the dates of purchase and proved the prices paid for these securities. It has also shown that they were sold through customary channels at an advertised public auction for a specific sum to one Berman, who obtained the money for the purchase from the petitioner's treasurer. The Commissioner challenges the *bona fides* of the transaction and asks the Court to disallow the deduction largely on that ground. This we are unwilling to do.

The record shows that the petitioner had no interest whatever in the purchase of the securities and has not reacquired them since the date of sale. More than a suspicion is necessary as a basis for disallowance. Since no facts controvene the orderly disposition of the securities and the resultant loss therefrom, the deduction is allowed.

In the seventh issue the petitioner claims a deduction of $7,319.96 as a bad debt due from I. L. Wallenstein. In October 1931 the petitioner purchased from brokers for $8,690.99 an account against Wallenstein secured by 500 shares of McLellan Stores stock. Wallenstein made interest payments in 1931 and 1932. The collateral was sold in 1936 for $1,302.28. Later, on April 16, 1936, Wallenstein paid $68.75, which was credited on the note. On May 12, 1936, the petitioner charged off the balance of $7,319.96 as a worthless debt.

The petitioner was not justified in considering the debt worthless. Although the record shows that an officer of the petitioner could find no property owned by the debtor, it also discloses that Wallenstein was employed at approximately $75 a week during 1936 and 1937; that he had a wife and one child, which child was the beneficiary of Foundation to the extent of $1,200 a year to be used for its education; and that Wallenstein was married to Nathan H. Gordon's niece. If the petitioner had been so inclined and had ignored the family relationship, we have no doubt that it could have secured a gradual decrease in the debt, and perhaps its eventual payment. The deduction claimed is disallowed.

The eighth issue involves the worthlessness of a debt due from I. Nick Gordon. In December 1929 the petitioner lent Nick Gordon $1,500. Gordon repaid $350. The petitioner's treasurer kept in close touch with Gordon until 1936. Gordon was a lawyer practicing in New York City and apparently was doing well. The petitioner had no cause to suspect his ability to pay the debt. However, in 1936, through a letter from the debtor to his uncle, petitioner's financial status was brought into question. Petitioner then discovered that Gordon had no property, had been disbarred, had left the city, and could not be located. At the end of that year it charged off the note as a bad debt.

We have no doubt that the record spells out the basis for the allowance of the deduction. It is possible that the petitioner was too indulgent to Nathan H. Gordon's nephew, but before 1936 it had no reason to doubt the collectibility of the note. It then proceeded to ascertain the true condition of the debtor's affairs and justifiably came to the conclusion that the debt was worthless.

In the ninth issue the petitioner seeks to deduct a contribution of $3,668 "made," as it asserts, to the Associated Jewish Philanthropies, Inc. The amount of such contribution was accrued on its books in 1936, but not actually paid until 1937. The respondent "admits that $3,668 was pledged and accrued in 1936 and was paid in 1937. Therefore, under the provisions of Section 23 (q) of the Revenue Act of 1936, the petitioner is entitled to the deduction in 1937 of the amount paid in 1937 subject to the limitation of Section 23 (q)."

The pertinent portions of section 23 (q) are as follows:

SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\*        \*        \*        \*        \*        \*        \*

(q) CHARITABLE AND OTHER CONTRIBUTIONS BY CORPORATIONS.—In the case of a corporation, contributions or gifts made within the taxable year to or for the use of a domestic corporation, or domestic trust, or domestic community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or the prevention of cruelty to children \* \* \*. Such contributions or gifts shall be allowable as deductions only if verified under rules and regulations prescribed by the Commissioner, with the approval of the Secretary.

Article 23 (q)–1, Regulations 94, provides as follows:

*Contributions or gifts by corporations.*—A corporation is entitled to deduct from gross income for a taxable year beginning after December 31, 1935, contributions or gifts to organizations referred to in section 23 (q), whether or not such contributions or gifts constitute business expenses, but only to the extent provided in that section.

Corporations may deduct, for a taxable year beginning after December 31, 1935, to the extent provided by section 23 (q), contributions or gifts to organizations referred to in that section, only for the taxable year in which they are actually paid, regardless of when pledged and regardless of whether the books and records

of the corporation are kept on the cash receipts and disbursements basis or the accrual basis.

Section 23 (q) of the Revenue Act of 1938 is identical with the similar section of the 1936 Act with the exception that the phrase "payment of which is made" is substituted for the word "made" (following the words "contributions or gifts").

The petitioner contends that its gift was "made" in 1936 when it entered an appropriate charge on its books, which were kept on an accrual basis. Such charge reflected its liability to pay the pledge. The pledge was actually paid in 1937.

The respondent couches his objection to the allowance in this language: "Since charitable contributions of a corporation are deductible only in the year of payment, the Court will sustain the action of the Commissioner of Internal Revenue in disallowing the deduction of an accrual in 1936." The respondent does not quote article 23 (q)-1, Regulations 94, but apparently he has based his assumption on that article.

The change in terminology in the 1938 Act obviously was made for some purpose. We can find no explanation or judical determination by this or any other court on that subject. We do find, however, the following enlightening comment on page 19 of Report No. 1860 of the Ways and Means Committee, House of Representatives, 75th Congress:

Sections 23 (o) and 23 (q). Deductions for Charitable and Other Contributions

These subsections provide the basic rule for the allowance of deductions of contributions or gifts for charitable or other purposes in the case of individuals (sec. 23 (6)) and all corporations (sec. 23 (q)).

Under the various revenue acts the deduction for contributions is allowed for the taxable year in which the contribution is made. Hence, a taxpayer on an accrual basis of accounting may claim that he is entitled to a deduction for the amount of a charitable pledge in one year, although he does not actually pay it until a later year, or indefinitely postpones payment. The doubt and confusion in such cases is aggravated by reason of the uncertainty and diversity in the law of the various States on the question as to when the liability of a subscriber to a charitable fund is fully incurred. In the interest of certainty in the administration of the revenue laws, it is desirable to dispel this confusion by enacting a clear and uniform statutory rule to govern this situation.

The bill provides that the deduction for contributions or gifts for charitable and other purposes shall be allowed only for the taxable year in which the contribution is actually paid regardless of whether the taxpayer is reporting income on the cash or the accrual basis. The allowance of the deduction in the year when actually paid will provide a clearer rule without hardship to the taxpayer and will eliminate the uncertainty in the administration of the deduction. Of course the payment of the contribution or gift cannot result in a double deduction.

It would seem clear therefore that article 23 (q)-1 does not set forth a proper interpretation of section 23 (q) of the Revenue Act of 1936.

The 1938 Revenue Act made a change in the law as it existed in 1936. It was not a case of defining the old law. Under the 1936 Act actual payment in the tax year by a taxpayer on an accrual basis was not required. Since the respondent does not question the character of the contribution or the propriety of its deduction (in 1937), we conclude that the petitioner is entitled to the deduction of $3,668, for 1936, representing its liability for the payment of its pledge to the Associated Jewish Philanthropies, Inc., made and accrued on its books during that year.

*Decision will be entered under Rule 50.*